**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

HERB LUX; STEPHEN CRUSE;
ANDREW MIKEL; EUGENE FORET,

       *Plaintiffs-Appellants,*

       v.

CHARLES E. JUDD; KIMBERLY T.
BOWERS; DONALD PALMER,
members of the Virginia State
Board of Elections, in their official
capacities,

       *Defendants-Appellees.*

No. 10-1997

Appeal from the United States District Court
for the Eastern District of Virginia, at Richmond.
Henry E. Hudson, District Judge.
(3:10-cv-00482-HEH)

Argued: May 12, 2011

Decided: July 6, 2011

Before DUNCAN and AGEE, Circuit Judges, and
David C. NORTON, Chief United States District Judge for
the District of South Carolina, sitting by designation.

Affirmed in part, reversed in part, and remanded by published
opinion. Judge Duncan wrote the opinion, in which Judge
Agee and Judge Norton joined.

**COUNSEL**

**ARGUED:** Jared Haynie, BOPP, COLESON & BOSTROM, Terre Haute, Indiana, for Appellants. Earle Duncan Getchell, Jr., OFFICE OF THE ATTORNEY GENERAL OF VIR-GINIA, Richmond, Virginia, for Appellees. **ON BRIEF:** James Bopp, Jr., Scott F. Bieniek, Josiah Neeley, BOPP, COLESON & BOSTROM, Terre Haute, Indiana, for Appellants. Kenneth T. Cuccinelli, II, Attorney General of Virginia, Stephen M. Hall, Assistant Attorney General, Charles E. James, Jr., Chief Deputy Attorney General, Wesley G. Russell, Jr., Deputy Attorney General, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Appellees.

---

**OPINION**

DUNCAN, Circuit Judge:

This case arises out of Herb Lux's unsuccessful attempt to run for Congress in Virginia's Seventh Congressional District. In 2010, Lux's application for ballot placement as an independent candidate was denied due to his failure to comply with the state's requirement that each petition signature in support of his candidacy be witnessed by a district resident. Lux, and his supporters Stephen Cruse, Andrew Mikel, and Eugene Foret (collectively "plaintiffs"), sued representatives of the Virginia State Board of Elections in their official capacities (collectively "the Board"), urging that the residency requirement violated their First and Fourteenth Amendment rights. The district court dismissed their complaint, relying in large part on our analysis in *Libertarian Party of Virginia v. Davis*, 766 F.2d 865 (4th Cir. 1985). For the reasons described below, we hold that the limited rationale underlying *Davis* has been superseded by subsequent Supreme Court decisions, and remand for further proceedings.

# I.

## A.

We briefly review the undisputed facts. Under Virginia law, prospective independent candidates for the U.S. House of Representatives ("the House") must file declarations of candidacy with the State Board of Elections. *See* Va. Code Ann. § 24.2-505(A). Such candidates must also file petitions in support of their inclusion on the ballot signed by 1000 "qualified voters."[1] *Id.* at § 24.2-506. At issue here is section 24.2-506's additional requirement that each of those signatures be "witnessed by a person who is himself a qualified voter, or qualified to register to vote, for the office for which he is circulating the petition." *Id.*

In 2010, Lux tried to run as an independent candidate for Virginia's Seventh Congressional District's House seat. Lux is a Virginia resident, but did not live in the Seventh District. As a nonresident of the Seventh District, Lux was not qualified to vote in that district's House election and was consequently barred by section 24.2-506 from witnessing petition signatures in support of his candidacy.[2]

Lux received and read a "candidate packet" that explained the "qualified voter" requirement for petition witnesses. J.A. 196. However, due to "confusion" on his part, he nevertheless personally circulated and witnessed sixty-three petitions in

---

[1]With certain exceptions not relevant here, the Code of Virginia defines a "qualified voter" as one who "is entitled to vote pursuant to the Constitution of Virginia and who is (i) 18 years of age on or before the day of the election . . . (ii) a resident of the Commonwealth and of the precinct in which he offers to vote, and (iii) registered to vote." Va. Code Ann. § 24.2-101.

[2]Lux's nonresident status did not affect his constitutional eligibility for the district's House seat, *see* U.S. Const. Art. I. § 2, nor does the Board otherwise contest his statutory or constitutional qualifications for the office.

support of his candidacy, and collected approximately 1063 signatures. *Id.* District residents—including Cruse, Mikel, and Foret—circulated and witnessed an additional fifteen candidate petitions on Lux's behalf, and collected a total of about 151 signatures. Lux submitted all seventy-eight petitions, as well as his timely declaration of candidacy, to the State Board of Elections on June 8, 2010.

On June 21, the Board sent Lux a letter informing him that, because he did not live in the Seventh District, it would not count any petition signatures that he had personally collected and witnessed. The letter further noted that even if all the remaining signatures witnessed by district residents were verified, Lux would still not meet the 1000-signature threshold necessary to appear on the ballot. Two days later, the Board issued a final ruling confirming that, with the petitions Lux had witnessed excluded, he had failed to provide sufficient signatures to qualify as a House candidate from Virginia's Seventh District.

B.

On July 13, 2010, plaintiffs sued the Board in the federal district court for the Eastern District of Virginia. Their one-count complaint alleged that section 24.2-506's district-residency requirement for petition witnesses violated their rights to freedom of speech and association under the First and Fourteenth Amendments. Plaintiffs sought a declaration that the residency requirement was unconstitutional. They also asked for preliminary and permanent injunctive relief against the Board's enforcement of the requirement, as well as attorney's fees.

The Board opposed plaintiffs' request for a preliminary injunction and, in early August, moved to dismiss their complaint under Fed. R. Civ. P. 12(b)(6). Recognizing the time constraints posed by the looming filing deadline for the November election, the parties consolidated their motions for

preliminary relief and disposition. In late August 2010, the district court denied plaintiffs' motion for a preliminary injunction and granted the Board's motion to dismiss.

In a comprehensive memorandum decision that relied in significant part on our decision in *Davis*, the district court held that plaintiffs had failed to state a plausible claim for relief. The district court focused in particular on *Davis*'s analysis of a statute that established ballot-access conditions in presidential elections for organizations that did not qualify as political parties under Virginia law; among these conditions was a residency requirement for petition witnesses similar to the provision at issue here. As the district court explained, *Davis* held that that requirement passed constitutional muster, as it served the "important purpose" of ensuring a threshold level of popular support, by mandating at least one in-district "activist" willing to "shoulder the burden of witnessing signatures." J.A. 235 (quoting *Davis*, 766 F.2d at 869-70). Citing, inter alia, "the weight of [this circuit's] contrary jurisprudence," the district court found that plaintiffs could not plausibly argue that the residency requirement violated their constitutional rights. J.A. 238.

On August 27, 2010, plaintiffs timely appealed. They subsequently sought injunctive relief, which we denied on September 15, 2010.

Plaintiffs then applied for an injunction from the U.S. Supreme Court. On September 30, 2010, Chief Justice Roberts, in his capacity as Circuit Justice for this circuit, declined to grant relief. *See Lux v. Rodrigues*, 131 S. Ct. 5, 7 (2010) (Roberts, Circuit Justice). Chief Justice Roberts acknowledged that plaintiffs "may very well be correct" that *Davis* had been undermined by subsequent Supreme Court decisions. *Id.* at 6. However, given that at least one of the Supreme Court cases on which Lux relied differentiated between the registration requirements before it and the sort of residency requirement applied here, the Chief Justice found

that Lux had not satisfied his burden of showing a right to relief that was "indisputably clear." *Id.* at 6-7.

## II.

Against that background, we turn to consideration of the arguments presented. As a threshold matter, the Board raises two distinct jurisdictional challenges. First, it contends that Cruse, Mikel, and Foret lack standing, as they cannot show a cognizable injury. Second, it urges that Lux's own claim has been rendered moot. We consider each argument in turn.

## A.

Article III standing requires plaintiffs to demonstrate, inter alia, "an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Doe v. Obama*, 631 F.3d 157, 160 (4th Cir. 2011). The Board contends that Cruse, Mikel, and Foret have not suffered a cognizable injury. It specifically argues that, as district residents, the three coplaintiffs were free to circulate petitions on Lux's behalf and, ultimately, to vote for him as a write-in candidate. Plaintiffs respond that the Board's refusal to count the petitions Lux had witnessed harmed all three coplaintiffs, as they "had worked and associated together for the very purpose of helping their preferred candidate appear on the ballot." Reply Br. at 11.

While we are not unsympathetic to Lux's supporters' frustration, they cannot show they suffered any cognizable harm arising out of the residency requirement. The Board duly counted the signatures collected by Cruse, Mikel, and Foret, and section 24.2-506 did not prevent them from casting write-in votes for Lux in the congressional election. On these facts, Lux's coplaintiffs' "abstract, generalized interest" in seeing his name on the ballot cannot "meet the requirement that an injury be concrete and particularized." *Bishop v. Bartlett*, 575 F.3d 419, 424 (4th Cir. 2009); *see also* 13A C.A. Wright, et

al., Federal Practice & Procedure § 3531.4, at 193 (3d ed. 2008) (observing that "[t]he purest reason to deny" voter standing "is that the plaintiff is not able to show an injury to the voter interest, however much the plaintiff may feel offended by the challenged practice").

We are also unpersuaded by plaintiffs' argument that Cruse, Mikel, and Foret have third-party standing to advance the First Amendment rights of others. Plaintiffs are correct that "courts sometimes permit litigants to challenge a statute 'not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression.'" *Burke v. City of Charleston*, 139 F.3d 401, 405 n.2 (4th Cir. 1998) (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973)). However, Lux's own challenge to the residency requirement thoroughly undermines plaintiffs' assertion that those potentially harmed by the statute lack incentive or initiative to contest it directly. Indeed, as plaintiffs' counsel recognized at oral argument, the participation of Lux's coplaintiffs in this litigation has no practical impact on the relief sought. In short, absent a concrete injury or a valid basis to assert third-party rights, we agree that Cruse, Mikel, and Foret lack standing to advance their claims.

## B.

The Board next asserts that, with the 2010 election long past, Lux's own claim is moot.[3] Specifically, it argues that it is highly unlikely that Lux will mount another independent run for Congress in a district in which he does not live and opt to witness his own petitions. The Board elaborates that Virginia is scheduled to undergo redistricting in 2011, which, it

---

[3]Given our determination that plaintiffs Cruse, Mikel, and Foret lack standing, we do not address the Board's argument that their claims are also moot.

claims, renders the prospect of Lux living outside of the Seventh Congressional District during the next congressional election yet more remote. The Board's claim lacks merit.

A case is moot "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Simmons v. United Mortg. & Loan Inv., LLC*, 634 F.3d 754, 763 (4th Cir. 2011). There is, however, a well-established mootness exception for conduct "capable of repetition, yet evading review." *Fed. Election Comm'n v. Wisc. Right to Life, Inc.*, 551 U.S. 449, 462 (2007); *see also Miller v. Brown*, 503 F.3d 360, 364 n.5 (4th Cir. 2007). This exception applies when "(1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration; and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again." *Wisc. Right to Life, Inc.*, 551 U.S. at 462. Election-related disputes qualify as "capable of repetition" when "there is a reasonable expectation that the challenged provisions will be applied against the plaintiffs again during future election cycles." *N.C. Right to Life Comm. Fund for Indep. Political Expenditures v. Leake*, 524 F.3d 427, 435 (4th Cir. 2008). There is clearly such an expectation here.

Plaintiffs' complaint explicitly stated that Lux is "considering running in a future election for the United State[s] House of Representatives in Virginia's Seventh Congressional District." J.A. 12; *cf. Leake*, 524 F.3d at 435 (rejecting the proposition that a former candidate qualifies for the exception "only if the ex-candidate specifically alleges an intent to run again in a future election"). The complaint also confirmed Lux's intent "to circulate his own candidate petitions" and desire to "recruit other petition circulators, including individuals who live outside Virginia's Seventh Congressional District [however it may then be configured], to circulate petitions on his behalf." J.A. 12. These statements support a reasonable expectation that Lux will be adversely affected by the residency requirement in future elections whether or not he lives

in the Seventh District. At the very least, there is a real possibility that section 24.2-506 will prevent Lux from recruiting preferred petition circulators. As a result, Lux's challenge fits comfortably into the mootness exception for conduct capable of repetition yet evading review.

## III.

We proceed to the merits of Lux's argument that the court erred by relying on *Davis* to dismiss his challenge to the district residency requirement. We review the grant of a motion to dismiss de novo, mindful that to survive such a motion, a complaint must "raise a right to relief" that is more than "speculative." *Coleman v. Md. Court of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010). Although the First Amendment protects many election-related activities, "it is also clear that States may, and inevitably must, enact reasonable regulations of parties, elections, and ballots to reduce election- and campaign-related disorder." *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997); *see also Buckley v. Am. Constitutional Law Found., Inc.*, 525 U.S. 182, 191 (1999) (emphasizing states' "considerable leeway . . . with respect to election processes"). When assessing the reasonableness of a particular regulation, the salient question is whether "the strength of the governmental interest . . . reflect[s] the seriousness of the actual burden on First Amendment rights." *John Doe No. 1 v. Reed*, 130 S. Ct. 2811, 2818 (2010); *see also Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983).

Lux contends that the district court erred by deferring to our reasoning in *Davis* when evaluating the district residency requirement's constitutionality. He argues in particular that the Supreme Court's intervening decisions in *Meyer v. Grant*, 486 U.S. 414 (1988), and *Buckley*, 525 U.S. at 182, so undermined *Davis*'s basis for sustaining the residency requirement as to overrule that portion of our analysis.[4] We agree.

---

[4]Because we find that *Meyer* and *Buckley* superseded the basis we relied on in *Davis* to sustain the residency requirement, we do not address Lux's additional argument that *Davis* is factually and legally distinguishable from his present claim.

Ordinarily, "[a] decision of a panel of this court becomes the law of the circuit and is binding on other panels." *United States v. Collins*, 415 F.3d 304, 311 (4th Cir. 2005) (quoting *Etheridge v. Norfolk & W. Ry. Co.*, 9 F.3d 1087, 1090 (4th Cir. 1993)). Nevertheless, a panel's decision may be "overruled by a subsequent en banc opinion of this court or," as relevant here, "a superseding contrary decision of the Supreme Court." *Id.* A Supreme Court holding that "specifically repudiate[s] the reasoning" on which a panel relied constitutes such contrary authority. *Etheridge*, 9 F.3d at 1090.

A brief review of *Davis* sets the stage for our assessment of the Supreme Court's intervening decisions. As noted above, the statute at issue in *Davis* established ballot-access requirements in presidential elections for organizations that failed to qualify as "political parties" under Virginia law. 766 F.2d at 866 (citing Va. Code § 24.1-159 (1980)). It mandated that such organizations secure the signatures of a threshold number of registered voters, "including at least two hundred voters from each congressional district" (the "distribution requirement"). *Id.* It also—much like the provision at issue here—required that those signatures be "witnessed and attested by a qualified voter from the same congressional district as the petition signer." *Id.* The Libertarian Party of Virginia challenged both requirements. *Id.* at 867. The district court dismissed the Party's complaint, and we affirmed. *Id.*

Our decision in *Davis* primarily addressed the constitutionality of the distribution requirement. *See id.* at 867-69. Indeed, we devoted just one paragraph of our opinion to assessing the constitutional merits of the residency provision. *Id.* at 869-70. Our brief discussion of that portion of the statute first noted that mandating that someone witness petition signatures helped combat election fraud. *Id.* at 869. We then echoed the district court's determination that the additional requirement that witnesses be district residents served a distinct state interest, explaining:

> [T]he requirement that the witness be from the same congressional district as the petition signer serves the important purpose of assuring "some indication of geographic as well as numerical support" by demonstrating "that within each congressional district there is at least one 'activist' sufficiently motivated to shoulder the burden of witnessing signatures." It is difficult to imagine how the state could accomplish these objectives by less restrictive means. The statute does not limit the number of signatures that an individual may witness nor does it require that witnesses be members of the Libertarian Party.

*Id.* at 869-70 (quoting *Libertarian Party of Va. v. Davis*, 591 F. Supp. 1561, 1564 (E.D. Va. 1984)) (internal citations omitted).

Guaranteeing sufficient in-district popular support was the lone state interest we identified in connection with the residency requirement. *See id.* In the more than twenty-five years since we decided *Davis*, the Supreme Court has twice considered—and on each occasion rejected as a rationale—the importance of ensuring a threshold level of grassroots support as a basis for restrictions on petition circulation. *See Buckley*, 525 U.S. at 204-05; *Meyer*, 486 U.S. at 426-27.

About three years after our holding in *Davis*, the Supreme Court considered a Colorado law that made payment of petition circulators a felony offense.[5] *See Meyer*, 486 U.S. at 417.

---

[5]The Colorado restriction at issue in *Meyer* concerned the circulation of petitions in support of ballot initiatives, rather than candidates. We do not find that distinction significant here. *Meyer*'s apparent rejection of the proposition that something more than a threshold signature requirement is necessary to assure popular support is plainly applicable in the candidate context. *Cf. Krislov v. Rednour*, 226 F.3d 851, 861 (7th Cir. 2000).

By the same token, we do not believe the fact that *Meyer* and *Buckley* addressed petition *circulators* rather than *witnesses* is salient. While that distinction may bear on the comparative intrusiveness of the measure at issue here, it does not affect the Court's rejection of the sole rationale, "some indication of geographical as well as numerical support," which underlaid the *Davis* residency-requirement analysis. 766 F.2d at 869-70.

In response to Colorado's argument that its regulation served a state interest, a unanimous Court explicitly addressed and rejected the claim that the challenged restriction helped ensure that a particular ballot initiative enjoyed "sufficient grass roots support." *Id.* at 425. The Court explained that the state's interest in ensuring a threshold level of support was "adequately protected by the requirement that no initiative proposal may be placed on the ballot unless the required number of signatures has been obtained." *Id.* at 425-26.

More than a decade later, the Supreme Court reached a similar conclusion in *Buckley*. There, the Court once more faced Colorado laws governing initiative-petition circulators, including a "requirement that . . . circulators be registered voters." *Buckley*, 525 U.S. at 186. In affirming the Tenth Circuit's determination that these provisions were excessively restrictive, the Supreme Court again emphasized that a threshold signature requirement was adequate to ensure that an initiative had secured sufficient popular backing to warrant placement on the ballot.[6] *See id.* at 204-05 (finding that "Colorado can and does meet [its] substantial interests in regulating the ballot-initiative process" by "less problematic measures," including a threshold signature requirement "[t]o ensure grass roots support").

---

[6]In support of its claim that *Davis* remains good law, the Board draws on *Buckley*'s suggestion that some residency requirements are presumptively constitutional. *See* Appellee's Br. at 23-24 (citing *Buckley*, 525 U.S. at 197). However, when the Supreme Court assumed, without deciding, "that a residence requirement would be upheld as a needful integrity-policing measure," it was concerned with *state* residency requirements. *See Buckley*, 525 U.S. 197. As the Court had already noted, such requirements were relevant to Colorado's effort "to ensure that circulators will be amenable to the Secretary of State's subpoena power, which in these matters does not extend beyond the State's borders." *Id.* at 196; *see also Initiative & Referendum Inst. v. Jaeger*, 241 F.3d 614, 617 (8th Cir. 2001). The Board has not claimed that the *district* residency requirement at issue here serves a similar purpose, but we also recognize that the Supreme Court has not explicitly struck down such a requirement.

In both *Meyer* and *Buckley*, the Supreme Court recognized that a signature requirement is generally adequate to ensure the popular support necessary to warrant ballot access. In doing so, the Court undermined the only state interest that *Davis* identified in support of a residency requirement. Against the backdrop of these intervening decisions, we can no longer say that an in-district witness requirement is necessarily justified by a state's desire to gauge the depth of a candidate's support.

Our recognition that *Davis*'s abbreviated residency-requirement analysis has been superseded should not be confused for a determination that the provision challenged here offends Lux's constitutional rights. Neither *Meyer* nor *Buckley* addressed the particular witness residency requirement at issue in this case. Moreover, we do not read either decision as foreclosing the possibility that something more than a threshold signature requirement may, in some circumstances, be constitutionally permissible as a means of ensuring popular support or achieving another state interest. In other words, we hold only that the district court erred by relying on *Davis* to find that Lux's complaint did not raise a plausible claim for relief and do not otherwise address the merits of Lux's constitutional challenge.

As this case comes before us on appeal of a Fed. R. Civ. P. 12(b)(6) dismissal, we reserve substantive consideration of Lux's claim for the district court in the first instance. On remand, the court should conduct an independent analysis of the state interest served by the district residency requirement and, after determining the appropriate standard of review, conclude whether that portion of section 24.2-506 unduly restricts Lux's constitutional rights. *See Celebrezze*, 460 U.S. at 789. Both parties are free to advance additional arguments in light of our holding.

## IV.

For the foregoing reasons we affirm the district court's dismissal of Lux's coplaintiffs, reverse the dismissal of Lux's claim, and remand for further proceedings.

*AFFIRMED IN PART,*
*REVERSED IN PART,*
*AND REMANDED*